MULTI-CRAFT CONTRACTORS, INC. *v.* PERICO, LTD., Gerber Life Insurance Co., Inc., and AdminOne Corporation

CA 06–46 239 S.W.3d 33

Court of Appeals of Arkansas
Opinion delivered September 13, 2006

*Bassett Law Firm, LLP,* by: *Vincent O. Chadick,* for appellant.

*Davis, Wright, Clark, Butt & Carithers, PLC,* by: *Constance G. Clark* and *Don A. Taylor,* for appellees.

SAM BIRD, Judge. Appellant Multi-Craft Contractors, Inc., a general contractor that maintains a partially self-funded health plan for the benefit of its employees, appeals a summary judgment entered for appellees Gerber Life Insurance Company Inc. and Perico Ltd., Gerber's general managing underwriter. Multi-Craft contends that the trial court erred in finding that no issues of material fact existed as to whether Gerber and Perico had adequate grounds to retroactively exclude a Multi-Craft employee from an insurance policy for excess-loss coverage. The appeal focuses on a form, completed as part of Multi-Craft's application for the policy, that required disclosure of "benefits paid, pended, or denied in the last 12 months." The trial court found that the quoted term was not ambiguous. We agree, and we affirm the summary judgment.

In July 2003 Gerber and Perico bound the excess-loss policy to Multi-Craft to cover claims exceeding $50,000 for employees participating in Multi-Craft's health plan. "Run-in coverage" was included for claims incurred during the twelve months before the policy's effective date of June 1, 2003. In September 2003 Multi-Craft submitted through its third-party administrator, AdminOne Corporation, over $70,000 in bills incurred by a diabetic plan participant and denied during the one-year retroactive period. Gerber and Perico refused the claim, asserting that AdminOne had misrepresented the amount of "benefits paid, pended or denied" the participant by inserting only $7,060.23 where this information was requested on the application form. Gerber subsequently notified Multi-Craft that Gerber was exercising its contractual right to revise the policy and that the participant was being excluded from its coverage.[1]

After receiving this notification, Multi-Craft brought an action for breach of contract and promissory estoppel against Gerber, Perico, and AdminOne. Gerber and Perico denied that the loss disclosure form was properly and correctly filled out, and they asserted that substantial and material information was withheld from them during the application process, including the submission of the excess-loss disclosure form. They contended that, under the clear terms of the disclosure form and policy,

---

[1] Because of privacy concerns, this individual was identified to the trial court only as "employee" or "plan participant."

Gerber was entitled to modify its excess-loss policy to exclude the employee as to whom claims information had been misrepresented.

At the conclusion of a hearing held on July 26, 2005, the trial court granted Gerber and Perico's motion for summary judgment. The court's written order of judgment, entered on August 12, 2005, included the following findings:

> 2. The Court finds that the excess loss disclosure form at issue in this matter is clear and unambiguous in its terms, conditions and intent and that a material failure to disclose information was made on said excess loss disclosure form.

> 3. Based upon the clear and unambiguous language of the excess loss disclosure form, the application and the contract of excess loss coverage itself, there is no material issue of fact[.]

An order of voluntary dismissal without prejudice was entered as to AdminOne, and Multi-Craft filed this appeal from the order of summary judgment in favor of Gerber and Perico.

Multi-Craft asserts that it presented evidence to the trial court sufficient to create five issues of fact: whether the application form was ambiguous, whether the application was completed correctly, whether an alleged misrepresentation was material, whether Gerber had knowledge of the employee's medical condition, and whether Multi-Craft had knowledge of the alleged misrepresentation. We do not agree.

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Hanks v. Sneed*, 366 Ark. 371, 235 S.W.3d 883 (2006). Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* The reviewing court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* The evidence is viewed on appeal in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Appellate review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *Id.*

The excess-loss disclosure form, which was dated May 8, 2003, was submitted through AdminOne as a required part of Multi-Craft's application process. The document included the following statements and instructions:

> This Disclosure Form is an integral part of your request for and/or renewal of Excess Loss Insurance. It will be relied upon by the Excess Loss Insurer in issuing an Excess Loss Insurance Contract.
>
> . . . .
>
> After receipt and review of the completed Disclosure Form, the Excess Loss Insurer reserves the right to revise the initial offer of coverage and/or to withdraw its offer to provide Excess Loss Insurance. Further, the Excess Loss Insurer reserves the right upon discovery of any omitted information, to revise or otherwise reconsider any underwriting actions that may have been made, and such actions may be retroactive to the Effective Date of coverage. . . .
>
> All representations shall be deemed to be material to acceptance of the risk by the Excess Loss Insurer and the Excess Loss Contract is to be issued in reliance of the truth and accuracy of such representations. Should subsequent information become known which, if known prior to issuance of the Excess Loss Contract, would affect the premium rates, factors, terms or conditions for coverage thereunder, the Insurer will have the right to revise the premium rates, factors, terms or conditions as of the effective date of the Excess Loss Contract. . . .

The disclosure form requested information on "any participants with a history or a current diagnosis of any serious disease or disorder, such as . . . cancer, diabetes, heart diseases, renal failure, . . . and potential organ transplants, etc."; the hand-written response stated that a particular employee had diabetes with renal manifestation. Also regarding this employee, the figure $7,060.23 was entered under the heading, "Benefits Paid, Pended or Denied in Last 12 Months."

Evidence submitted to the trial court, in addition to the pleadings and insurance documents, included deposition testimony regarding the application process. Anita Carol Holmes, a claims processor for AdminOne, testified that she could review a person's claims history by using a computer system. She said, "All of that information as far as paid, pended, and denied claims would be on the RIMS system. When we deny a claim, there is a code

that indicates why it's denied. When a claim is suspended or pended, we suspend it with a particular code . . . ."

Richard Barrows, president of Multi-Craft, testified that Multi-Craft relied on AdminOne to properly fill out the application, including the excess-loss disclosure form. He said that he had no idea if AdminOne provided on the form accurate information regarding the amount of benefits paid, pended, or denied. He said that he became aware of a problem with the issuance of the policy after he assumed the policy had been issued, that Multi-Craft then "just paid the claims all out of our pocket," and that a policy of insurance excluding the employee was eventually issued by Gerber and Perico.

Gary Baker, one of the owners of AdminOne, testified, "I don't know where you would write in pended and denied and paid in that little square . . ., because there is just not enough room on the form. That's not the intent of the form."

Mason Baker, an AdminOne employee, testified that he wrote the figure "$7,060.23"on the excess-loss form, which he said was "the total amount of the claims that were paid" but "not the total amount that were pended." He stated that he "chose not to put in denied or pended," further explaining:

> I didn't need to tell anyone at Perico or Gerber that this figure did not respond to the pended or denied portion of the question, because it was obvious. That's what's implied based on experience. When they want additional information they will come back and ask for it.

He said that he did not provide the amount of claims denied or pended on the excess loss disclosure form "because that information has never been asked for or supplied." He stated that he had filled out the same disclosure on several occasions for Perico. His testimony continued:

> [B]ecause I never provide the amount of denied or pended claims, I didn't do it this time for Employee. We had never given Perico a dollar amount for claims denied.
>
> It's very obvious from the numbers in the column on the loss form that there are claims for Employee that are out there that have either been incurred and are paid or have been denied, and from that point you're going to dig deeper, which goes down to the Large

Case Management notes, which is exactly what happened — so this was all standard procedure exactly like we had done on multiple occasions. . . .

The answer I provided is accurate.

James Cook, Perico's vice-president of underwriting, testified that on May 9, 2003, AdminOne submitted the disclosure form to Perico and also emailed Perico a "Large Case Management Report" revealing that one employee had been on dialysis since at least February 2003. Cook stated that "it was fair to assume, based upon reasonable dialysis charges of $6,000 per month, that [the employee] could easily have had $30,000 in medical bills for dialysis for the period of time from February 2003 through June 2003." Cook said that Trinice Harris, Perico's underwriter assigned to the case, made a handwritten notation in her file that the employee had kidney failure after she received the email and that she bound coverage for Multi-Craft under Gerber's excess-loss policy on July 10, 2003, with an effective date of June 1, 2003 and "run-in coverage" for claims incurred during the twelve months prior to the effective date.

Cook revealed that he took over the underwriting process after Harris voluntarily resigned her employment on August 15, 2003. Cook testified that Harris explained to him before she left that there was a "transplant policy" in force for the diabetic employee that would exclude transplants from the insurance policy. He explained that, after telephoning Harris in late August and learning that she had relied upon the information written on the disclosure form, Cook made the decision to exclude the employee from coverage.

He said that his company was not concerned so much about a condition as it was about the risk to the plan, explaining that the risk was what was being underwritten. He said that "a large case management report . . . may or may not represent a potential risk." He stated his belief that the "substantial dollar amounts" of the employee's claims should have been on the form's list of pended claims, which "would have made a difference in the way we underwrote the case had we known . . . ."

Cook noted that the large case management report did not have "any dollar amounts" on it. He testified:

> From an underwriting standpoint in relationship to the risk that Gerber Life is taking, i.e., claims over $50,000, the dollar amount

becomes very, very important. And as I explained before, there are several reasons why people with expensive, on-going conditions might not have — the plan may not be liable for them. We're not interested in that, we don't care about that. We don't care if a person is getting their bills paid by the coverage they might have on their spouse's policy. We don't care if the bills are being paid under Medicare. What we're underwriting is what does the plan — what liability does this claim or claimant represent to the plan.

It is possible that a person who is incurring $6,000 a month on dialysis could have only $7,000 in combined, paid, pended or denied claims because somebody else is paying the claims. We've assumed that [$7,060.23] was all that was paid, pended, or denied in the previous twelve-month period. We relied upon the accuracy of that number. It doesn't matter who paid it as long as it wasn't a risk to the plan.

Cook stated that the employee was later excluded from the policy's coverage because the amount on the form was not accurate, but he acknowledged that on September 8, 2003, he had given different reasons for excluding the employee from coverage.

Hex Bisbee, Multi-Craft's chief financial officer, testified that his company could call AdminOne to ask what the denied claims of a particular plan participant were. He stated, "I would expect that they would get that information for us."

James Reagan, an assistant marketing director for Perico, testified that he received a "large case management report" about the employee from AdminOne's Mason Baker on May 9, 2003. Reagan said that he forwarded the report to underwriter Trinice Harris, that Perico underwriters determine what information a third-party administrator needs to provide to the underwriting department, and that the report included a statement that the employee had renal disease and was currently on dialysis. Reagan testified that he was first notified by an email from James Cook on September 8, 2003, that Perico would retroactively exclude the employee from the policy. Reagan stated that the two reasons Cook gave on September 8 for the exclusion were that "no information about [the employee's] current condition was supplied prior to the binding of the policy" and that the third party administrator "had told Trinice that [the employee] would be off the plan."

Erwin Rittinger, a principal and employee of Perico, stated his belief that the claim amount indicated on the disclosure form

should have been around $70,000. He stated that Trinice Harris, as the underwriter who was assigned the case, had the ultimate authority to make underwriting determinations. Rittinger said that Harris did not need to know the amount of charges being generated as a result of the employee's renal failure and dialysis in order to discharge her responsibilities, and he said that he did not think that Multi-Craft acted improperly. Regarding the disclosure form's request for "benefits paid, pended, or denied," Rittinger stated: "It's clear to me from the use of the word 'or' that it's the sum. . . . [T]he form is clear to me that it asks for the sum of the three."

Mark Kuhls, a potential expert witness, testified that he would look to the parties' course of dealing in order to define the word "or" in "benefits paid, pended or denied." He stated that the terms "denied" and "pended" are sometimes interchangeable, that things move from one to the other, and that the disclosure form "does request the amount of pended claims and it requests denied claims as well."

The trial court's written order of summary judgment set forth the following finding: "Based upon the clear and unambiguous language of the excess loss disclosure form, the application and the contract of excess loss coverage itself, there is no material issue of fact . . . ." The written order specifically incorporated comments from the court's oral ruling. Those comments were as follows:

> I have reviewed again the Perico Excess Loss Insurance Disclosure Form and I think a decision on this motion can be made by reviewing it, referring to the pleadings, as far as facts which are not in dispute, and of course, looking at the testimony that the parties have pointed to. I think it's important to reiterate some of the statements in this Form.
>
> In part, the Form provides that "the excess loss insurer reserves the right, upon discovery of any omitted information, to revise or otherwise reconsider any underwriting actions that may have been made and any such actions may be retroactive to the effective date of coverage." It "is agreed that the statements in this disclosure form plus any and all materials submitted to Perico for this group are hereby warranted by you [the plan sponsor]. All representations shall be deemed material to acceptance of the risk. And the excess loss contract is to be issued in reliance of the truth and accuracy of such representations." Also, and this is very important in my mind,

the Form provides that "should subsequent information become known, which [if] known prior to issuance of excess loss contract would effect premium rates, facts, terms and conditions or coverage hereunder, the insurer will have the right to revise the premium rates, factors, terms or conditions as of the effective date of the excess loss contract by providing written notice."

In my mind, what Gerber did was exercise its right under the contract and issued an addendum to the policy of insurance specifically excluding coverage for ... this person that had the renal failure.

Going back to page two of the Excess Loss Disclosure form, [which asks for] benefits paid, pended or denied in the last twelve months, the Court finds that that statement is not ambiguous. It is crystal clear to me after reading the entire document again this afternoon, as I believed it to be before I heard argument today. But it is obvious from — if you look no further than the excess loss insurance disclosure form, that at least one of these companies, Gerber, is making it clear to you, you better tell us everything."

I know Mr. Baker said, "Well, I never give them the information where it says paid, pended or denied, I just give them paid," I think is what he said, "I never give them pended or denied." Well, that may very well be true. I'm not saying that the gentleman isn't telling the truth. But maybe in the past, he never got caught before. And even if — it's still an omission, because . . . when reading the whole document, it's obvious they want everything they can get their hands on to make their decision.

I believe that the phrase "paid, pended or denied in the last twelve months" clearly means all three and not just, "well, you pick which one you want to give us and we'll accept your choice and you don't even have to tell us which one it is." I do not think that makes any sense at all to say that would be the meaning of that phrase.

Multi-Craft and AdminOne, I don't think it is disputed that this information was an omission. True, they say, "well, we've got a custom in the trade for doing that." Again, I disagree with you. It may have been a custom, but the hand got called this time.

### Point on Appeal

We now turn to Multi-Craft's point on appeal, that the trial court erred in finding that no issues of material fact existed as to whether appellees Gerber and Perico had adequate grounds to

retroactively exclude a Multi-Craft employee from excess-loss coverage. Multi-Craft asserts that it presented evidence to create five fact issues. We address the first three together.

Multi-Craft first contends that it presented evidence establishing that the application form was susceptible to more than one reasonable interpretation, in that the phrase "benefits paid, pended or denied" has various meanings. Second, Multi-Craft contends that it created a fact issue as to whether the application was completed correctly. Third, Multi-Craft asserts that a fact issue existed as to whether the misrepresentation was material.

Multi-Craft argues that the confusion created by the form is apparent from the deposition testimony of Gary Baker and Mark Kuhls. Perico and Gerber respond that it is clear from the contract itself that the trial court's interpretation of the language is the only practical, reasonable, and fair interpretation consistent with the object and intent of the parties. They urge that we reject a hyper-technical interpretation of the policy as "patently unreasonable." They assert that, as a matter of law, the disclosure form was not ambiguous.

In *Elam v. First Unum Life Insurance Co.*, 346 Ark. 291, 57 S.W.3d 165 (2001), our supreme court examined the question of ambiguity in an insurance contract:

> The law regarding construction of an insurance contract is well settled. If the language of the policy is unambiguous, we will give effect to the plain language of the policy without resorting to the rules of construction. *Norris v. State Farm Fire & Cas. Co.*, 341 Ark. 360, 16 S.W.3d 242 (2000); *Western World Ins. Co. v. Branch*, 332 Ark. 427, 965 S.W.2d 760 (1998). On the other hand, if the language is ambiguous, we will construe the policy liberally in favor of the insured and strictly against the insurer. *Id.* Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one reasonable interpretation. *Norris*, 341 Ark. 360, 16 S.W.3d 242; *Smith v. Prudential Prop. & Cas. Ins. Co.*, 340 Ark. 335, 10 S.W.3d 846 (2000). Ordinarily, the question of whether the language of an insurance policy is ambiguous is one of law to be resolved by the court. *Norris*, 341 Ark. 360, 16 S.W.3d 242; *Western World*, 332 Ark. 427, 965 S.W.2d 760. Where, however, parol evidence has been admitted to explain the meaning of the language, the determination becomes one of fact for the jury to determine. *See Smith*, 340 Ark. 335, 10 S.W.3d 846; *Southall v. Farm Bureau Mut. Ins. Co.*, 276 Ark. 58, 632 S.W.2d 420 (1982).

Our case law demonstrates that where there is a dispute as to the meaning of a contract term or provision, be it an insurance or other contract, the trial court must initially perform the role of gatekeeper, determining first whether the dispute may be resolved by looking solely to the contract or whether the parties rely on disputed extrinsic evidence to support their proposed interpretation. As Justice George Rose Smith explained, "[t]he construction and legal effect of written contracts are matters to be determined by the court, not by the jury, *except when the meaning of the language depends upon disputed extrinsic evidence*." *Id.* at 60, 632 S.W.2d at 421 (emphasis added). Thus, where the issue of ambiguity may be resolved by reviewing the language of the contract itself, it is the trial court's duty to make such a determination as a matter of law. On the other hand, where the parties go beyond the contract and submit disputed extrinsic evidence to support their proffered definitions of the term, this is a question of fact for the jury. In the latter situation, summary judgment is not proper.

346 Ark. at 296-97, 57 S.W.3d 169-70.

We have recently observed that contracts of insurance should receive a practical, reasonable, and fair interpretation, consonant with the apparent object and intent of the parties in light of their general object and purpose. *Ison v. So. Farm Bureau Cas.*, 93 Ark. App. 502, 221 S.W.3d 373 (2006). Further, different clauses in a contract must be read together and construed so that all of its parts harmonize, if that is at all possible, and it is error to give effect to one clause over another on the same subject if the two clauses are reconcilable. *Id.*

Here, the trial court interpreted the phrase "benefits paid, pended or denied" to mean "all three" instances. The court's bench ruling included a discussion of the importance of particular statements in the disclosure form:

In part, the Form provides that "the excess loss insurer reserves the right, upon discovery of any omitted information, to revise or otherwise reconsider any underwriting actions that may have been made and any such actions may be retroactive to the effective date of coverage." It "is agreed that the statements in this disclosure form plus any and all materials submitted to Perico for this group are hereby warranted by you [the plan sponsor]. All representations shall be deemed material to the acceptance of the risk. And the excess loss contract is to be issued in reliance of the truth and

accuracy of such representations. Also, and this is very important in my mind, the Form provides that "should subsequent information become known, which is [sic] known prior to issuance of excess loss contract would effect premium rates, facts, terms and conditions or coverage thereunder, the insurer will have the right to revise. . . ."

We agree with the trial court's conclusion that Gerber clearly instructed an applicant to "tell . . . everything." Further, we agree with the court's assessment that the purpose of the form was to permit Perico, as underwriter for Gerber, to assess the risk of the coverage it would undertake on behalf of Multi-Craft's plan participants.

 We hold that, as a matter of law, the disclosure form was not ambiguous. Therefore, no genuine issue of material fact was created as to whether Perico and Gerber rightfully excluded the employee from excess-loss coverage under the policy. In light of this determination that the form was not ambiguous, it follows that no fact issue was created to whether the application was completed correctly when AdminOne submitted only the dollar amount of claims paid rather than the total amount of benefits paid, pended, or denied. Additionally, the form specified that all representations "shall be deemed material to acceptance of the risk" and "the excess loss contract is to be issued in reliance of the truth and accuracy of such representations." In light of this language, there was no fact issue as to whether the misrepresentation of "benefits paid, pended, or denied" was material to the determination of policy coverage. Thus, we hold that there is no merit to Multi-Craft's assertions that fact issues were created regarding whether language of the excess-loss disclosure form was ambiguous, whether the application was completed correctly, and whether an alleged misrepresentation was material.

Multi-Craft asserts that it created a fourth issue of fact as to whether Perico and Gerber had knowledge of the employee's medical condition because the "large case management notes" furnished to them provided sufficient information to warrant an investigation of the employee's claims. Multi-Craft complains that Cook, after learning that information about the employee's condition had been disclosed two months before coverage was bound, revised the initial reason for excluding him from coverage. Multi-Craft points to testimony that Cook first denied coverage because the information was not supplied prior to the binding of coverage, yet later said that the basis of denial was because the amount of

"paid, pended, and denied claims" was not accurately reflected on the disclosure form. Thus, it asserts that the alleged misrepresentation was not a valid basis for retroactive exclusion of the employee from coverage. Citing *Old American Life Insurance Co. v. McKenzie*, 240 Ark. 984, 403 S.W.2d 94 (1966), Multi-Craft asserts that any misrepresentation on the application, even if material, was not a proper basis for excluding coverage because the insurer had information sufficient to warrant an investigation.

The present case is distinguishable from *Old American*, which held that an applicant for accident and disability insurance should not be denied benefits of the policy although he did not disclose his complete medical history in his application. The supreme court ruled that when the applicant reported a previous disc operation on the application, he put the insurer upon notice as to his serious back operation; further, when he provided the insurer with the name of his surgeon to whom the insurer could turn for exact and precise information if so desired, "he substantially met all burdens imposed upon him in his relations with [the insurer] under his contracts of insurance." *Old Am.*, 240 Ark. at 987, 403 S.W.2d at 96.

■ The issue in the present case is not simply whether Gerber and Perico had knowledge of the employee's medical condition. Nor is the issue whether the disclosure form, which was part of the application process, put them on notice of the employee's condition. The issue is whether they were put on notice of the amount of claims being generated against Multi-Craft's health-care plan by the employee, including "benefits paid, pended, or denied." James Cook testified that Perico's concern was the liability of the plan and that the dollar amount of the employee's claims would enable Perico to make an informed decision as to whether to accept the risk of extending coverage to him. We hold that, under the specific terms of the disclosure form, the material misrepresentation of the amount of claims denied to the employee gave Gerber and Perico the right to retroactively exclude this employee from the policy's coverage.

Finally, Multi-Craft asserts that it created a fact issue as to whether it had knowledge of the employee's condition. It cites *Ford Life Insurance Co. v. Samples*, 277 Ark. 351, 641 S.W.2d 708 (1982), for the proposition that an insurer must show that the insured was aware of a misstatement before an insurance policy will be rendered void. Gerber and Perico point to terms of the

"Administrative Services Agreement" under which Multi-Craft delegated to AdminOne the responsibility "to maintain records regarding payments of Claims, denials of Claims, and Claims pended." Because of this delegation, Gerber and Perico assert that any ignorance on the part of Multi-Craft as to the employee's claims history was irrelevant. We agree.

The insured in *Ford Life* purchased a policy of credit term-life insurance in conjunction with the purchase of a pickup truck, first signing an insurance form that included the execution of a "good health" statement. Prior to the signing, the soliciting insurance agent had learned that the insured was in poor health and was drawing disability insurance, which was founded upon an anxiety reaction and chronic brain syndrome. The day after signing the contract, the insured suffered a myocardial infarction that led to his death. Observing that the insured died as a result of a disease not connected to his total disability condition, the *Ford Life* court held that a "good health" statement on the application for life insurance, even if material in some respects, will not void the policy unless the insurer shows a causal relation between the misrepresentation and the loss. The court observed, "The 'good health statement' obviously did not include the condition which allowed him to receive his Veterans Administration benefits because by agreement his disability check was to be used to pay for the pickup truck."

In the present case, Multi-Craft asserts that there was a fact question as to whether it was aware of a material misrepresentation on the application because AdminOne, rather than Multi-Craft, had access to information regarding the amount of claims previously denied to the employee. It is well established, however, that a corporation is affected by knowledge of its agent. In *Hill v. State*, 253 Ark. 512, 521-22, 487 S.W.2d 624, 631 (1972), our supreme court reviewed this rule of agency law:

> [A] corporation, which can act only through its officers and agents, is affected with notice which comes to an officer, agent or employee in the line of his duty and the scope of his powers and authority and . . . knowledge of an officer, agent or employee acquired in the ordinary discharge of his duties is ordinarily to be imputed to the corporation.

Here, the disclosure form specifically asked for information about the employee's condition, and Multi-Craft delegated to AdminOne the responsibility for providing complete

and accurate information. Multi-Craft delegated to AdminOne the responsibility of acquiring knowledge about employee's claims paid, denied, or pended; it therefore cannot claim that it lacked knowledge of this information.

The trial court's grant of summary judgment is affirmed.

Affirmed.

BAKER and ROAF, JJ., agree.